PER CURIAM.
Upon a complaint by The Florida Bar this Court appointed a referee to conduct a hearing regarding Garcia’s alleged misconduct. Pursuant to article XI, Rule 11.-06(9)(b) of the Integration Rule of The Florida Bar, the referee’s report and record were duly filed with this Court. We have jurisdiction. Art. V, § 15, Fla. Const.
The Board of Governors of The Florida Bar, while approving the referee’s findings of fact and recommendations of guilt, has petitioned for review of the discipline recommended in the case under article XI, Rule 11.09(1) of the Integration Rule. The sole question before the Court, therefore, is whether a harsher discipline than that recommended by the referee is in order. Prior to addressing this contention, it may be helpful to examine the referee’s factual findings, on which his recommendations as to guilt and discipline were based.
Upon consideration of the pleadings and evidence, the referee made the following uncontested findings of fact, which we quote in part:

“Case No. 65,468

“Count I

“1. In April, 1982, the Respondent undertook to represent one Gloria Stanley in prosecuting a claim against Pepsi Cola. The claim arose from a bottle of the soft drink which Ms. Stanley’s daughter consumed and which made her sick and caused her to be hospitalized for several days.
“2. Although Ms. Stanley suggested that she received a $2,000 offer from the insurance adjustor representing Pepsi Cola the only evidence presented at the hearing in this cause suggest that the only firm offer to settle the case was in the amount of $250.00.
“3. Upon receiving the $250.00 fee offer Ms. Stanley then went to the Respondent who agreed to represent her in the case. At or about the time of the Respondent’s initial interview with Ms. Stanley the Respondent caused a release to be signed authorizing the release of medical information by dispensers of medical services.
“4. In September, 1982, the Respondent wrote a letter to his client asking for the minimum amount for which she would settle. The Respondent failed to respond to communications from the insurance adjustor about the case.
*1255 “5. In October, 1982, the Respondent moved his practice from Winter Haven, where he had been retained by his client, to Lakeland, Florida. In June, 1983, he moved his practice from Lakeland to Tampa. He did notify his client of the move to Lakeland but she was only able to discover the move to Tampa after making several telephone calls on her own initiative.
“6. The Respondent had no further contact with his client until the hearing before the grievance committee on April 12, 1984.
“7. The discovery the Respondent conducted in the case consisted of reviewing hospital records approximately six months after being retained and talking to nurses at the hospital.
“8. At a date uncertain to this Referee the Respondent apparently determined that Ms. Stanley did not have a viable case and he determined not to represent her any further in the matter. The Respondent [failed to advise his client] of the applicable statute of limitations in the case. Since the date of the alleged injury was some time during the month of July, 1981, it would appear that a four year statute of limitations in the case would expire on or after July 1, 1985.
“9. The Respondent’s conduct in this matter persuades this Referee that he undertook to represent a prospective plaintiff in a matter about which he knew very little. Apparently in an eagerness to get his newly started private practice off the ground he took a case with which he quickly became disenchanted. Although his discovery was far short of what might be expected of a professional in this situation he nonetheless discovered that there was little if any merit to his client’s case. For a long period of time he continued to have minimal activity in the matter rather than simply bite the bullet and advise his client that she had no case....

“Count II

“2. The Respondent had never previously handled an adulterated food case and was not fully aware of the extent and type of damages he could claim in behalf of the mother and the child.
“3. The evidence clearly demonstrates that the Respondent was simply not equipped by training or experience to represent his client in this adulterated food case. Of the options available to him he chose the most inappropriate; i.e., rather than refuse the case, refer it to someone else, or to bring in experienced co-counsel, the Respondent chose to make feeble stabs at prosecuting the claim himself.

“Count III

“1. In May, 1982, the Respondent was retained by Jacqueline Staton to prosecute a claim against an insurance company for property losses suffered during a burglary to her home on December 27, 1981.
“2. The Respondent accepted the case and was paid $145.00 as a retainer.
“3. On May 6, 1982, the Respondent wrote to the insurance company’s claims office in Orlando and submitted a sworn statement and proof of loss. The insurance company responded on May 25, June 22, and July 8 of 1982, requesting additional information to permit them to evaluate the claim. In the last communication they indicated to the Respondent that they would close the file unless they received a response by August 6, 1982. On August 5, 1982, the Respondent replied, enclosing an authorization for release of mortgage information and indicating that he had spoken with his client about other requested, materials.
“4. On August 19, 1982, the insurance company’s claims representative wrote to the Respondent indicating that there were three remaining discrepancies, all of which ... had not been clarified. Although the Respondent did have some problems communicating with Ms. Staton, he did not respond to the August 19, 1982, inquiry from the insurance company.
“5. In October, 1982, the Respondent advised his client that he was moving from Winter Haven to Lakeland.
*1256 “6. On October 28, 1982, the claims representative again contacted the Respondent to try to get response to her August 19, 1982, letter or to several messages left between that date and September 24, 1982, when she finally contacted him and told him what was needed to settle the claim. The representative apparently re-telephoned the Respondent on October 11, 1982, during which conversation the Respondent advised that he would send a letter with all the discrepancies explained. This was not done. At that time the insurance company indicated that they were closing the file but would reopen it for further consideration once the information was received.
“7. On December 8, 1983, the Respondent wrote to the claims representative and furnished a copy of an amended police report but furnished no other information.
“8. On December 28, 1983, the claims representative wrote to the Respondent stating that they would give no further consideration to the claim unless the information they had been seeking was received before February 1, 1984.
“9. On January 30, 1984, the Respondent filed a two count complaint against the insurance company on behalf of his client.
“10. The Respondent did nothing further after filing the complaint. He withdrew from representation of Ms. Staton when another attorney appeared and prosecuted the case to a successful settlement. Although the Respondent notified Ms. Sta-ton of his move to Lakeland he did not advise her of his subsequent move to Tampa.
“11. After agreeing to represent Ms. Staton the Respondent apparently became disenchanted either with Ms. Staton’s case or with Ms. Staton personally. As a result he failed to diligently prosecute her case and pursued a course of conduct very similar to that followed in Count I. He continued to make feeable feints at representing his client while at the same time he effec-. tively abandoned her.

“Count IV

“2. The Respondent apparently filed the lawsuit because he thought that the claim representative’s December 28, 1983, letter to him might cause the claim to be lost completely.
“3. The Respondent apparently filed a lawsuit on behalf of his client only when he felt that he must do so to avoid some legal consequence for the continued inaction in the case. The lawsuit he filed was so meager as to be of virtually no benefit whatever. The complaint reflected an extremely limited understanding of the cause of action he sought to pursue.
“Cose No. 65,936

“Count I

1. In April, 1983, the Respondent met with one Peggy Haroon in a parking lot in Winter Haven, Florida, and agreed to represent her in a dissolution action that she wished to prosecute against her husband.
“2. Approximately one month later Mrs. Haroon met with the Respondent and signed some forms related to the dissolution action. She could not recall exactly what the forms were.
“3. The Respondent later mailed Mrs. Haroon a second set of the same forms to be signed. Those forms were sent to her by mail accompanied by a letter. The letter requested that she sign and return the enclosed forms so that he could proceed with the dissolution action.
“4. Subsequently, ... the Respondent advised Mrs. Haroon that the dissolution action was being advertised in Pakistan. He further advised her that it would be several weeks before they could have a hearing because the judge was old and slow.
“5. Mrs. Haroon called the Clerk of the Circuit Court in Polk County after the communication referred to in the preceding paragraph. She was advised that no dissolution action had been filed on her behalf.
“6. In January, 1984, Mrs. Haroon wrote the Respondent and discharged him *1257 as her attorney. She requested a return of the deposit she had paid him. The Respondent then sent her an additional copy of the letter he had previously written to her, with a new bill.
“7. After Mrs. Haroon complained to The Florida Bar the Respondent returned $80.00 to her.
“8. Although the Respondent suggests that he told Mrs. Haroon he was not going to file the action until he was paid in full this Referee finds that such is not the case. He represented to her, at least by implication, that the dissolution action had been filed and was proceeding.
“9. Mrs. Haroon and her husband maintained their marital domicile in Florida. She was seeking nothing in the way of personal relief from her husband; she simply wanted a divorce. In suggesting to Mrs. Haroon that the action was being advertised in Pakistan, her husband’s residence at the time of the proposed dissolution, the Respondent was either making excuses for his dilatory practice or simply didn’t know how to obtain a dissolution under these circumstances.
“10. The Respondent’s conduct in this matter persuades this Referee that he undertook to represent a prospective plaintiff in a dissolution action when he was apparently ill equipped to prosecute it. Although he purported to represent her in this matter he did very little on her behalf.

“Count II

“1. In March, 1984, Donnis Foster, a former paralegal of the Respondent paid for repairs to his car with a trust account check of the Respondent’s in the amount of $830.00. The check dated March 30, 1984, was returned by the bank marked account closed. It was subsequently discovered Mr. Foster had taken a number of Respondent’s trust account checks, forged Respondent’s signatures and used them for his own benefit. Respondent thereafter filed complaints with the appropriate authorities.
“2. Respondent’s trust account was maintained at NCNB National Bank of Florida in Winter Haven. It was opened originally with another attorney who went off the account in approximately May of 1983. The account was closed in March, 1984. Review of the account records beginning in January, 1983, demonstrated that much of the required record keeping information was lacking. Many of the monthly bank statements, cancelled checks and check stubs were missing. Numerous deposit slips did not list the client(s) from which the money was received. Respondent did not maintain any individual client ledger sheets although he maintained one overall sheet and some index cards which indicated the amount received but no other pertinent data such as the date. No complete or adequate record of trust fund disbursements and the appropriate recipients was kept.
“3. Although Respondent indicates he did reconcile his account, he did not maintain any of the minimally required quarterly reconciliations.
“4. Money had to be transferred from his office account to his trust account on at least one occasion to cover overdrafts in the account in 1983. The account also ran negative balances at the bank in late 1983 and early 1984 primarily due to the activities of Mr. Foster. The Respondent states he did not determine these problems until he received his bank statement dated January 2, 1984, which reflected seven overdraft charges during the month of December and a closing negative balance of $343.72. The records for October and November, 1983, transactions were not available. The statement for January 31, 1984, reflects eleven overdraft charges and an ending negative balance of $213.72. In February a deposit was credited for that amount on February 16 bringing the closing balance to zero. The account was thereafter closed out in early March.
“5. Prior to the problems with Mr. Foster, the Respondent had misused moneys within the trust account by paying clients prior to the clients' checks actually clearing necessitating a subsequent deposit into the account. The Respondent paid client Wil *1258 son Davis $150.00 on August 18, 1983, and $200.00 to his own paralegal wife on August 29, 1983, for work on the Davis matter prior to receiving and depositing $200.00 in cash on August 30, 1983. Although the Respondent indicates he received other cash from Mr. Davis, he did not deposit that into his trust account. Respondent also advanced costs out of the trust account prior to making a corresponding deposit for those costs.
“6. Although many of the problems in Respondent’s trust account were the apparent fault of his former employee, the Respondent was not maintaining or operating the trust account within the substantial minimum requirements of The Florida Bar’s Integration Rule and corresponding Bylaw.”
In case no. 65,468, Count I, the referee recommends that respondent be found guilty, having specifically violated Disciplinary Rules 2-106(E), 2-110(A)(2), 6-101(A)(3) and 7-101(A)(l) and (2) of the Code of Professional Responsibility; that respondent be found guilty of violating Disciplinary Rules 6-101(A)(l) and (2) of the Code of Professional Responsibility as to Counts II and IV, and that respondent be found guilty of violating Rule 6-101(A)(3) of the Code of Professional Responsibility in regard to Count III.
In Count I of related case 65,936, the referee has recommended that respondent be found guilty of violating article XI, Rule 11.02(3)(a) of the Integration Rule of The Florida Bar and Disciplinary Rules 1-102(A)(4) and (6), 6-101(A)(3), and 7-101(A)(1) and (2) of the Code of Professional Responsibility. As to Count II, the referee recommends that respondent be found guilty of violating art. XI, Rule 11.02(4) (misuse of trust funds) and 11.02(4)(c) (and corresponding Bylaws for improper trust account record keeping) as well as Rules 9-102(A) and (B)(3) of the Code of Professional Responsibility.
The referee recommends that respondent be publicly reprimanded, Rule 11.10 of the Integration Rule of The Florida Bar, and that he be placed on two consecutive years of probation, one for each charge. In reaching this conclusion, the referee considered in mitigation respondent’s relatively recent admission to the Bar and his lack of prior discipline. The referee additionally noted that some of respondent’s problems with the trust account were based on the criminal acts of his employee.
The Board of Governors contends that harsher discipline must be meted out in this case. It is argued that respondent’s acts of misconduct, considered together, create “a collage of inadequacy” requiring suspension. The Bar contends that the functions of discipline set forth in The Florida Bar v. Lord, 433 So.2d 983 (Fla.1983), will not be met unless respondent is suspended for at least sixty days in addition to two years of supervised probation.
We, with the referee, find to the contrary. The referee’s recommended discipline is fair both to society and to respondent, and is sufficiently severe under these circumstances to deter others who might be prone or tempted to become involved in like violations. Lord, 433 So.2d at 986; The Florida Bar v. Hawkins, 444 So.2d 961 (Fla.1984); The Florida Bar v. Pahules, 233 So.2d 130 (Fla.1970).
Accordingly, respondent Jose A. Garcia is hereby publicly reprimanded and placed on supervised probation for a period of two years. We adopt the recommended conditions of probation set forth in the referee’s report. Judgment for the costs of this proceeding in the amount of $1,734.45 is hereby entered against respondent, for which sum let execution issue.
It is so ordered.
BOYD, C.J., and ADKINS, OVERTON, McDONALD and BARKETT, JJ., concur.
EHRLICH, J., concurs in part and dissents in part with an opinion, in which SHAW, J., concurs.